IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EMCOR GROUP, INC, *et al.*,

    *Plaintiffs,*

    v.

GREAT AMERICAN INSURANCE
COMPANY,

    *Defendant.*

Civil Action No.: ELH-12-0142

**MEMORANDUM OPINION**

This case involves a dispute concerning insurance coverage under three successive commercial crime insurance policies issued by Great American Insurance Company ("GAIC"), defendant, to EMCOR Group, Inc. and three of its subsidiaries: The Poole and Kent Corporation ("PKC"), Forti/Poole and Kent LLC ("FPK"), and Monumental Investment Corporation (collectively, "Emcor"), plaintiffs.   The policies were issued for annual periods beginning December 1, 2002 and ending December 1, 2005.   In November 2005, Emcor notified GAIC of over $10 million in losses stemming from the fraudulent conduct of two former executives of PKC and FPK between 1999 and 2005.   *See* Compl. ¶¶ 1, 16 (ECF 2); Sworn Proof of Loss, Compl. Exh. B, at 1 ("POL," ECF 2-2).   On September 30, 2010, Emcor submitted a claim to recover for its losses.   Through the GAIC policy in effect for the period December 1, 2004 to December 1, 2005, Emcor believes it had continuous coverage for its losses, dating to 1999, when Emcor was insured by Factory Mutual Insurance Company ("Factory Mutual").   Compl. ¶¶ 2-4, 17-19; *see* POL.[1]   After GAIC failed to pay Emcor's claim, Emcor filed suit, alleging breach

---

[1] GAIC and Emcor "agreed to extend the time within which to submit a sworn proof of loss to October 1, 2010."   Compl. ¶ 18.

of contract.  *See* Compl. ¶¶ 5, 81-88.[2]

The parties filed pre-discovery[3] cross motions for partial summary judgment, asking the Court to determine, as a matter of law, the extent of coverage under the policies with respect to fraud occurring prior to December 1, 2004.  Defendant contends that, under the terms of the GAIC policies, it is obligated to pay only for losses sustained as a result of acts committed during the policies that covered December 1, 2003 to December 1, 2005.  *See* GAIC Motion for Partial Summary Judgment ("Motion," ECF 29) & Supporting Memorandum ("GAIC Memo," ECF 29-1).  In a combined cross motion for partial summary judgment and opposition to GAIC's Motion, plaintiffs maintain that they are entitled to coverage for losses from fraudulent acts committed during the entire period of coverage by GAIC under all three of its successive policies, *i.e.*, from December 1, 2002 to December 1, 2005, as well as for the period covered by a policy issued by Emcor's prior insurer, Factory Mutual, for the period December 1, 1999 to December 1, 2002.  *See* Emcor Cross Motion ("Cross Motion," ECF 32) & Supporting Memorandum of Law ("Emcor Memo," ECF 33).  Both motions are supported by exhibits.[4]

_____

[2] Jurisdiction is founded on diversity of citizenship, under 28 U.S.C. § 1331.

[3] Since the motions were filed, the parties conducted some discovery.  For example, the parties have exchanged interrogatories.  *See, e.g.*, ECF 33-2 ("GAIC's Responses to Plaintiffs' First Set of Interrogatories").  Additionally, Emcor cites in its Reply the deposition testimony of GAIC's claims adjuster in this case, Thomas Maloney.  *See* ECF 45 at 13-15.  But, Emcor represents that it has not yet taken the deposition of Dennis Burns, the GAIC underwriter, whose testimony Emcor considers pertinent.  *See* ECF 45 at 15.  And, Emcor requests additional discovery on the position previously taken by GAIC in regard to unrelated disputes concerning similar policies.  *Id.*

[4] GAIC filed two exhibits containing excerpts from the two GAIC policies covering December 1, 2003 to December 1, 2005.  *See* ECF 29-2.  Emcor filed multiple exhibits, including the Affidavit of Susan J. Reinhard, Senior Director of Claims and Risk Management for EMCOR Group, Inc. ("Reinhard Aff.," ECF 32-1), to which it attached copies of each GAIC policy and its Factory Mutual policy, *see* Reinhard Aff., (ECF 32-2); the Affidavit of Joseph F. Gildner, who is offered as a fidelity insurance expert ("Gildner Aff.," Exh. 32-7), along with excerpts from various treatises and Gildner's "expert report" from a case in Ohio involving

The motions have been fully briefed,[5] and no hearing is necessary to resolve them.  *See*

Local Rule 105.6.  For the reasons that follow, the Court will grant GAIC's Motion for Partial

Summary Judgment and deny Emcor's Cross Motion for Partial Summary Judgment.

## Factual Background

The GAIC Policies

Emcor held three successive one-year commercial crime insurance policies issued by

GAIC between December 1, 2002 and December 1, 2005.  *See* Reinhard Aff. ¶ 4.  The first,

GAIC Policy No. CRP 524-49-86-00, covered the period from December 1, 2002 to December 1,

2003 (the "2002 Policy," ECF 32-4).  The second, GAIC Policy No. CRP 524-49-86-01, covered

the period from December 1, 2003 to December 1, 2004 (the "2003 Policy," ECF 32-5).  The

third, GAIC Policy No. CRP 524-49-86-02, covered the period from December 1, 2004 to

December 1, 2005 (the "2004 Policy," ECF 32-6).  Each GAIC policy provided coverage to

EMCOR Group, Inc. and certain subsidiaries, including PKC and FPK, for losses arising from

"employee dishonesty."  *See* Reinhard Aff. ¶¶ 3-4.  The terms of the three policies were largely

---

GAIC and DeBra-Kuempel, an Emcor subsidiary (the "*DeBra* Case"), *see* Gildner Aff., Index of
Exhs. (ECF 32-8); and the Affidavit of Michael Faircloth, Esq., an Associate with Oliva &
Associates, ALC, counsel of record for plaintiffs and DeBra-Keumpel in the *DeBra* Case
("Faircloth Aff.," Exh. 32-15).  Emcor attached various filings from the *DeBra* Case, including
the deposition transcript of Thomas Maloney, who was GAIC's claims adjuster in the *DeBra*
Case.  *See* Faircloth Aff., Index of Exhs. (ECF 32-16).

[5] After several extensions, GAIC filed a Reply in support of its Motion and in opposition
to Emcor's Cross Motion ("GAIC Reply," ECF 38), to which Emcor replied ("Emcor Reply,"
ECF 45), also after several extensions.  Thereafter, GAIC moved for leave to file a surreply
("GAIC Surreply," ECF 46), contending that Emcor had changed its posture mid-briefing.  I
have considered the Surreply, which includes the 2002 Policy Declarations page, along with the
amount of the premium paid for that particular policy.  *See* ECF 46-2 at 2.  On March 22, 2013,
more than three months after GAIC filed its surreply, and just before this Opinion was to be
issued, Emcor sought leave to file a surreply, ECF 51, offering additional evidence in support of
its position.  Despite the belated filing, I have considered Emcor's surreply.  ECF 51-1.

similar, but not identical.[6]

The 2004 Policy's "**DECLARATIONS PAGE**" indicated the applicable limits of coverage and deductibles.  *See id.* at 14.  It provided for a $20,000,000 limit of insurance for employee dishonesty, along with a $100,000 deductible, *id.*, applied on a per-occurrence basis.  And, it defined the "Policy Period" as "12/1/2004 to 12/1/2005."  *Id.*

The scope and amount of coverage for employee dishonesty under the 2004 Policy was set forth in the "**EMPLOYEE DISHONESTY COVERAGE FORM**."  It provided, in relevant part, 2004 Policy at 22-23:

> **B.  LIMIT OF INSURANCE**:
>
> > The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.
>
> **C.  DEDUCTIBLE:**
>
> > **1.**  We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount, shown in the Declarations.  We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance.
>
> **D.  ADDITIONAL    EXCLUSIONS,    CONDITION[S]    AND DEFINITIONS:**  In addition to the provisions in the Crime General Provisions Form, this Coverage Form is subject to the following:
>
> > **1.  Additional Definitions:**
> >
> > > b.  **"Occurrence"** means all loss caused by, or involving, one or more "employees," whether the result of a single act or series of acts.

The 2004 Policy included the following language in its "**GENERAL CONDITIONS**," *see id.* at 18-19:

> > **4.  Duties in the Event of Loss:** After you discover a loss or a situation that may result in loss of, or loss from damage to, Covered Property,

---

[6] The differences are discussed, *infra*, at 7.

you must:

    a. Notify us as soon as possible.

    b. Submit to examination under oath at our request and give us a signed statement of your answers.

    c. Give us a detailed, sworn proof of loss within 120 days.

    d. Cooperate with us in the investigation and settlement of any claim.

**5. Extended Period to Discover Loss:** We will pay only for covered loss discovered no later than 1 year from the end of the Policy Period.

*     *     *

**10.  Loss Sustained During Prior Insurance:**

    a. If you, or any predecessor in interest sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:

        (1) this insurance became effective at the time of cancellation or termination of the prior insurance; and

        (2) this loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

    b. The insurance under this Condition is part of, not in addition to, the Limits of Insurance applying to this insurance and is limited to the lesser of the amount recoverable under:

        (1) this insurance as of its effective date; or

        (2) the prior insurance had it remained in effect.

**11.  Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate:  If any loss is covered:**

    a.  partly by this insurance; and

    b.  partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

*     *     *

**14.  Policy Period:**

a. The Policy Period is shown in the Declarations.

b. Subject to the Loss Sustained During Prior Insurance condition, we will pay only for loss that you sustain through the acts committed or events occurring during the Policy Period.

Additionally, the 2004 Policy provided a "DIMINUTION IN DEDUCTIBLE ENDORSEMENT," which stated, *id.* at 53:

A.  With respect to a loss for which coverage is provided by this policy and which is sustained partly during the period of other policies providing coverage for such loss issued to the insured . . . and terminated or cancelled or allowed to expire as of the inception date of this policy, the amount of the deductible that is applicable to the portion of the loss sustained during this policy period shall be reduced in whole or in part by:

1)  The amount of the loss which is sustained during the period of other policies if such loss is less than the amount of the deductible applicable to the loss under these other policies, or

2)  The amount of the deductible applicable to the loss sustained by the insured during the other policies if the applicable deductible is less than the amount of the loss sustained during that period.

Each GAIC policy in issue included the terms outlined above. But, each policy provided for payment of a separate premium. *See, e.g.*, 2004 Policy at 14 (showing premium of $82,500 for 2004 Policy, "payable at inception"). Significantly, at the time one GAIC policy became effective, the prior GAIC policy was terminated. For example, the Declarations page of the 2004 Policy's "Crime Coverage Part" said, *id.* at 14: "By acceptance of this coverage part, you give us

- 6 -

notice cancelling prior Policy or Bond Nos. CRP 524-49-86-01 [the 2003 Policy], the cancellation to be effective at the time this Coverage Part becomes effective."

It appears that only three modifications were made to the GAIC policies over the course of Emcor's coverage.  First, both the 2003 and 2004 policies carried "Endorsement No. 8," which defined "employee" to include "temporary employees," *see* 2004 Policy at 48; 2003 Policy at 53, whereas the 2002 Policy did not include "temporary employees" within the definition of "employee."  Second, the 2004 Policy added Motorola, Inc., Freddie Mac, and Wachovia to the "Schedule of Loss Payees."  *Compare* 2004 Policy at 5 (listing loss payees), *with* 2003 Policy at 10 (listing loss payees) *and* 2002 Policy at 8 (listing loss payees).  Third, the amount of the premium increased from $75,000 in the 2002 Policy to $82,500 in the 2003 and 2004 policies.  *Compare* 2004 Policy at 14 *and* 2003 Policy at 20 (both showing $82,500 premium) *with* 2002 Policy Declaration Sheet (ECF 46-2 at 2) (showing $75,000 premium).[7]

The Factory Mutual Policy

Prior to 2002, Emcor held a commercial crime policy with Factory Mutual (the "FM Policy," ECF 32-3), which covered the period between December 1, 1999 and December 1, 2002.  *See* FM Policy at 2 ("Policy Period: From: December 1, 1999 To: December 1, 2002").  Coverage for employee fraud under the FM Policy was substantially similar to that provided under the GAIC policies.  The FM Policy also provided for a coverage limit of $20,000,000 per occurrence.  *See* FM Policy at 2, 11.  Section III, General Condition F of the FM Policy, is identical to Condition 14 of the GAIC policies.  General Condition F stated: "The Policy Period is shown in the Declarations.  Subject to the LOSS SUSTAINED DURING PRIOR

---

[7] Unlike the copies of the 2003 Policy and 2004 Policy submitted by Emcor in support of its Cross Motion, the copy of the 2002 Policy submitted by Emcor does not reflect the amount of the premium.  However, the 2002 Policy Declarations Sheet submitted by GAIC in support of its Surreply includes that information.

INSURANCE condition, [Factory Mutual] will pay only for loss that the Insured sustains through acts committed or events occurring during the Policy Period." *Id.* at 11. The "LOSS SUSTAINED DURING PRIOR INSURANCE" condition of the FM Policy (Section III, General Condition E) was identical to Condition 10 of the GAIC policies. *See id.* Additionally, like Condition 5 of the GAIC policies, "Endorsement No. 18" of the FM Policy excluded from coverage any loss "unless [such loss was] discovered and written notice thereof given to [Factory Mutual] within . . . 1 year following termination of [the FM Policy] . . . ." *Id.* at 36.

Item 7 of the "Declarations" of the FM Policy suggests that Emcor previously held another policy with Factory Mutual, which was cancelled at the time the FM Policy became effective. *See* FM Policy at 2. It stated: "By acceptance of this Policy the Insured gives this Company notice cancelling prior Policy Number 90040203 the cancellation to be effective at the time this Policy becomes effective." *Id.* In a condition in Section VI of the FM Policy, called "TERMINATION OF THE PRIOR POLICY," the FM Policy provided, *id.* at 16:

> The taking effect of this Policy shall terminate, if not already terminated, all previous liability of this Company to the Insured under the policy specified in Item 7 of the Declarations of this Policy. By reason of the issuance of this Policy, the prior policy shall not cover any loss not discovered and notified to this Company prior to the effective date of this Policy as specified in Item 3 of the Declarations.

<u>The Claimed Loss</u>

On November 29, 2005, Emcor provided notice to GAIC for loss allegedly resulting from a long-running fraud perpetrated by W. David Stoffregen, formerly the President of PKC, and Michael Forti, formerly Executive Vice President and Chief Operating Officer of FPK and Executive Vice President of PKC. Compl. ¶¶ 16, 18, 23-25, 34. According to Emcor, Stoffregen and Forti together executed several fraudulent schemes by which they caused PKC and FPK to pay them and others for fictitious expenses. *See id.* ¶¶ 23-36. Both employees were indicted in

2005 by a federal grand jury sitting in the District of Maryland.  *Id.* ¶ 27; POL at 1.  Forti pled

guilty in September 2005 and was sentenced "to concurrent terms of six months in prison and

three years of supervised release."  Compl. ¶ 30.  Stoffregen pled guilty in November 2006 and

was sentenced to seventy-eight months of imprisonment, followed by a three-year term of

supervised release.  *Id.*  ¶¶ 28-29.  The particulars of the fraud are not presently in dispute.

On September 30, 2010, in accordance with the parties' tolling agreement, Emcor

submitted a Sworn Proof of Loss to GAIC seeking coverage under the 2004 Policy in the amount

of $10,621,157, for losses suffered between 1999 and 2005 as a result of the fraudulent schemes.

*Id.* ¶ 18; *see* POL.  To date, GAIC has failed to pay Emcor's claim.  Compl. ¶¶ 21, 81.

According to Emcor, "GAIC has never provided [Emcor] with a coverage opinion or provided

any reason why the claim, or any part of it, has not been paid."  Emcor Memo at 10.  Therefore,

Emcor filed suit, seeking damages of $10,621,157 for breach of contract, plus interest and

"consequential and incidental damages."  Compl. ¶ A ("Prayer for Relief").

## Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is

appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  A fact is "material" if it "might affect the

outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

 "A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'"

showing that there is a triable issue.  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 322-24 (1986). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. In resolving the motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Liberty Lobby*, 477 U.S. at 248.

When, as here, the parties have filed cross motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir.) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). "Both motions must be denied if the court finds that there is a genuine issue of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, Federal Practice & Procedure § 2720, at 336-37 (3d ed. 1998, 2012 Supp.).

In regard to matters of contract interpretation, such as the parties have raised here, the Fourth Circuit has observed in an oft-quoted passage:

> "A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract

> is ambiguous or unambiguous on its face.  If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue.  Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.  If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact."

*Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007)

(quoting *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).

## Discussion

A.  *Choice-of-Law*

When federal jurisdiction is premised on diversity of citizenship, a federal court is obligated to apply the choice-of-law rules of the forum state.  *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citations omitted).  In Maryland, "'[i]nsurance policies are contracts and are treated and construed like other contracts.'"  *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012) (quoting *Cont'l Cas. Co. v. Kemper Ins. Co.*, 173 Md. App. 542, 546, 920 A.2d 66, 68 (2007)).  Thus, in the absence of a governing choice-of-law provision, Maryland applies "'the rule of *lex loci contractus* to matters regarding the validity and interpretation'" of an insurance policy.  *TIG Ins.*, 209 Md. App. at 161, 58 A.3d at 507 (quoting *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995)).  "'Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction.'"  *TIG Ins.*, 209 Md. App. at 161-62, 58 A.3d at 507 (quoting *The United States Life Ins. Co. v. Wilson*, 198 Md. App. 452, 463, 18 A.3d 110, 116 (2011)).  And, Maryland appellate courts have consistently held that

"'[t]he *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid.'" *TIG Ins.*, 209 Md. App. at 162, 58 A.3d at 507 (quoting *Cont'l Cas.*, 173 Md. App. at 548, 920 A.2d at 69).

Neither party has addressed the choice-of-law considerations pertinent to "*locus contractu.*" GAIC relies on Maryland law, but makes no showing as to the governing law. And, Emcor presumes, without any explanation or showing, that Maryland law controls this dispute. *See* Opp. at 11-12.

PKC and FPK, the companies that employed Stoffregen and Forti, are both Maryland corporations. But, Maryland courts do not presume that a contract is made in the state in which a company is headquartered. *See TIG Ins.*, 209 Md. App. at 164-65, 58 A.3d at 508-09 (collecting cases where governing law was other than location of the insured's headquarters). As the case law demonstrates, a policy can be delivered, and a premium can be paid, outside of a company's state of incorporation or principal place of business. *See id.* Furthermore, EMCOR Group, Inc., which is incorporated under the laws of Connecticut and lists a Connecticut address, is specified as the "Named Insured" in the 2004 Policy. *See* 2004 Policy at 2. As a result, EMCOR Group, Inc. may well have paid the premiums for the insurance policies from Connecticut, and Connecticut may also be the location where the policy was delivered. GAIC's home state is Ohio, which might also be relevant. In sum, I cannot conclude definitively that the law of Maryland applies to this case.

Nonetheless, GAIC does not contest Emcor's assumption that Maryland law applies here. And, as indicated, both sides rely on Maryland law. Given that PKC and FPK are both located in Maryland, and Emcor initiated suit in Maryland, there is at least some basis to justify Emcor's

assumption as to the applicability of Maryland law.  Therefore, for the purpose of the instant

motions, I will assume that Maryland law applies.[8]

B.  *Governing Principles of Insurance Contract Interpretation Under Maryland Law*

As noted, in Maryland, "the interpretation of an insurance policy is governed by the same

principles generally applicable to the construction of other contracts."  *Mitchell v. AARP*, 140

Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see State Farm Mut. Ins. Co. v. DeHaan*, 393

Md. 163, 193, 900 A.2d 208, 225-26 (2006); *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298,

305, 753 A.2d 533, 537 (2000); *TIG Ins. Co.*, 209 Md. App. at 161, 58 A.3d at 507.

Accordingly, "'ordinary principles of contract interpretation apply.'"  *Megonnell v. United Servs.

Auto. Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation omitted); *see Dutta v. State

Farm Ins. Co.,* 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

In interpreting an insurance policy, Maryland courts "construe the instrument as a whole

to determine the intention of the parties."  *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 390 Md.

449, 459-60, 889 A.2d 387, 394 (2006).  "'[T]he primary principle of construction is to apply the

terms of the insurance contract itself.'"  *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App.

122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330

Md. 758, 779, 625 A.2d 1021 (1993)).  The Maryland Court of Appeals has explained that

judicial "interpretation of insurance contracts to determine the scope and limitations of the

insurance coverage, like any other contract, begins with the language employed by the parties."

*MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003).

Generally, Maryland courts "analyze the plain language of [an insurance] contract according to

the words and phrases in their ordinary and accepted meanings as defined by what a reasonably

---

[8] In any event, the principles of contract construction are fairly uniform.  To the extent
that the law of another state applies, the Court is not aware of any significant differences.

prudent lay person would understand them to mean." *Universal Underwriters*, 135 Md. App. at 137, 761 A.2d at 1005; *see Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14-15, 852 A.2d 98, 106 (2004); *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997). "[A]ny construction of a contract that makes another provision superfluous is generally disfavored." *Nat'l Cas. Co. v Lockheed Martin Corp.*, 415 F. Supp. 2d 596, 602 (D. Md. 2006) (citing *Balt. Gas & Elec. Co. v. Commercial Union Ins. Co.*, 113 Md. App. 540, 688 A.2d 496, 503 (1996)).

Additionally, "'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined." *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)); *see also Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). If there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *Valliere v. Allstate Ins. Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Walk*, 382 Md. at 14-15, 852 A.2d at 106; *Dutta*, 363 Md. at 556, 769 A.2d at 957. And, Maryland courts will consider the construction of policy terms by courts in other jurisdictions. *Pac. Indem.*, 302 Md. at 401, 488 A.2d at 495 ("'The decisions of [other] jurisdictions have special significance in this context because heretofore this Court has recognized that like a state which adopts, by copying, a foreign statute, . . . parties who adopt an insurance policy, which apparently has nationwide use and has been judicially construed in five or six states, adopt with

it the uniform judicial construction that is has received in other states.'") (quoting *Fisher v. Tyler*, 248 Md. 100, 106-07, 394 A.2d 1199, 1203 (1978)).

If the court deems the provisions of an insurance policy unambiguous, the meaning of the provisions is determined by the court as a matter of law. *Cole*, 359 Md. at 305, 753 A.2d at 537. In that circumstance, "'a court has no alternative but to enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta*, 363 Md. at 557, 556 A.2d at 1138). A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Cole*, 359 Md. at 306, 753 A.2d at 537. The treatise, G.J. Couch, 2 Couch Cyclopedia of Insurance Law (2d ed. 1959), on which the Maryland appellate courts have relied, states: "The criterion is ambiguity from the standpoint of a layman, not from that of a lawyer." *Id.* § 15:84, at 416-418. And, "[a] term which is clear in one context may be ambiguous in another." *DeHaan*, 393 Md. at 194, 900 A.2d at 226.

Both sides insist that the policies are clear and unambiguous. But, they construe them quite differently. Alternatively, Emcor suggests that, if I do not agree with its construction, then the policies are ambiguous, and must be construed in its favor. Emcor Memo at 21-27. In any event, "[a] contract is not ambiguous merely because the parties do not agree as to its meaning." *Floyd v. Mayor & City of Council of Balt.*, 179 Md. App. 394, 451, 946 A.2d 15, 48 (2008).

If a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Cole,* 359 Md. at 305, 753 A.2d at 537. Extrinsic sources that may be considered include "an interpretation of the term employed by one of the parties before the dispute arose," *id.*, as well as parol evidence that illuminates the parties' intent. *JMP Assocs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 345 Md. 630, 635, 693 A.2d 832, 834 (1997) (citing *Bailer v. Erie Ins.*, 344 Md. 515, 521-22, 687 A.2d 1375, 1378 (1997)). Additionally, "'[w]here parol or extrinsic

evidence is otherwise admissible . . . in construing a contract, expert testimony is admissible to aid the fact finder in interpreting words or phrases in the instrument which have a peculiar meaning in a trade, business or profession.'" *Truck Ins. Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 434, 418 A.2d 1187, 1190 (1980) (quoting *Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md. App. 119, 131, 380 A.2d 627, 635 (1977)).   However, "'[e]xpert testimony will not be admitted to prove to a court . . . the proper or legal construction of any instrument of writing.'" *Truck Ins.*, 288 Md. at 434, 418 A.2d at 1190 (quoting *Della Ratta*, 38 Md. App. at 131, 380 A.2d at 635).

"'Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 771 (citation omitted); *see Bushey v. N. Assurance Co. of Am.*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992).   But, "if ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros.*, 390 Md. at 459-60, 889 A.2d at 394; *see Callaway*, 375 Md. at 280, 825 A.2d at 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer."). Nonetheless, "if disputed factual issues are presented by the evidence bearing on the ambiguity, construction of the contract is for the jury." *Truck Ins.*, 288 Md. at 433, 418 A.2d at 1190; *accord Pac. Indem. Co.,* 302 Md. at 389, 488 A.2d at 489 ("If the extrinsic evidence presents disputed factual issues, construction of the ambiguous contract is for the jury.").

C. *The Parties' Contentions*

The parties dispute the temporal limitation of GAIC's contractual coverage obligations

and, in particular, whether GAIC is obligated to cover losses that occurred prior to the 2003 and 2004 policy periods.  Indeed, they offer starkly contrasting views of the policy language and resulting coverage.[9]

GAIC advocates a strict text-based approach, relying on what it regards as the unambiguous language of the 2004 Policy.  *See* GAIC Memo at 3-4; GAIC Reply at 5-9.  It argues that each of its policies was separate and discrete and, pursuant to the terms of Conditions 10 and 14, each policy offered coverage only for conduct occurring during the specified Policy Period, as well as the period of coverage under the immediately preceding policy.  Based on the terms of the 2004 Policy, GAIC maintains that coverage is available to Emcor for the period December 1, 2003 through December 1, 2005.  *See* GAIC Reply at 3-4, 9-13.

Conversely, Emcor takes the position that the 2004 Policy unambiguously obligated GAIC to provide coverage for all of the fraudulent conduct, because Emcor had continuous coverage, beginning with the FM Policy.  *See* Emcor Memo at 13-14, 16-20; Emcor Reply at 11-12.  Essentially, Emcor contends that each GAIC policy extended coverage for all prior policy periods, without supplanting any earlier policies.  Put another way, Emcor maintains that, collectively, the scheme of insurance provided by GAIC entitled Emcor to coverage under all prior GAIC policy periods, as well as the earlier FM Policy.  *See* Emcor Memo at 13-14, 16-20.

As noted, Condition 14 of the 2004 Policy stated: "Subject to the Loss Sustained During Prior Insurance condition, [GAIC] will pay only for loss that [the insured] sustain[ed] through the acts committed or events occurring during the Policy Period."  2004 Policy at 19.  According to GAIC, Condition 10, the Loss Sustained During Prior Insurance condition, extended coverage

---

[9] Although the parties mention the concept of "occurrence," they do not address whether the fraudulent conduct constituted a single "occurrence."

to the period covered by the 2003 Policy, but not to a period prior to that time.  As indicated,

Condition 10 stated, *id.*:

> a.  If you, or any predecessor in interest sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:
>
> > (1)  this insurance became effective at the time of cancellation or termination of the prior insurance; and
> >
> > (2)  this loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

In interpreting Condition 10, GAIC contends that the words "this insurance" clearly

referred to the insurance coverage created by the 2004 Policy.  According to GAIC, Condition

10's coverage for losses sustained during "any prior insurance" was limited to the 2003 Policy

period because, by the terms of the 2004 Policy, coverage was extended to loss sustained "during

the period of any prior insurance," even though "the time to discover [the] loss had expired," if

"this insurance [*i.e.*, the 2004 Policy] became effective at the time of . . . termination of the prior

insurance."  *See* GAIC Memo at 3-4; GAIC Reply at 5-9.  GAIC points out that only the 2003

Policy was terminated when the 2004 Policy became effective.  Thus, it insists that the 2004

Policy provided coverage only for losses sustained as a result of fraudulent acts occurring on or

after December 1, 2003 through December 1, 2005.  GAIC Memo at 3-4; GAIC Reply at 5-9.

In support of its position, Emcor insists that "[r]eading all of [the relevant policy]

provisions together," Emcor Memo at 13, GAIC's construction is at odds with the plain meaning

of the 2004 Policy.  Emcor argues that GAIC "ignores Condition 11 entirely," *id.*, and there is no

basis for GAIC to conclude that the phrase in Condition 10, "'any prior insurance' means the

immediately expiring policy only."  *Id.* at 14.  Based on Condition 11 and the Diminution in

Deductible Endorsement, Emcor maintains that the words "this insurance" in Condition 10 referred to a plan of continuous coverage. *See id.* at 13-14, 16-19. Interpreting "this insurance" to refer solely to the 2004 Policy would, in Emcor's view, improperly render superfluous certain language in Condition 11 and the Diminution in Deductible Endorsement. *See id.* at 26-29; Emcor Reply at 9, 11-13. And, Emcor maintains that the words "prior insurance" in Condition 10 meant the FM Policy, which was terminated at the time that the 2002 Policy—the first GAIC policy obtained by Emcor—became effective. *See* Emcor Memo at 17. Thus, Emcor posits that coverage is available for all losses sustained as a result of fraud perpetrated while both the FM Policy and the 2002, 2003, and 2004 GAIC policies were in effect.

Alternatively, if the Court were to find ambiguity, Emcor urges consideration of the extrinsic evidence that it has offered in connection with its Cross Motion. *See* Emcor Memo at 31-32. In its view, the extrinsic evidence supports its interpretation of the 2004 Policy. *Id.*; Emcor Reply at 20-21. GAIC vigorously opposes the Court's consideration of the extrinsic evidence, and has not offered any extrinsic evidence of its own. *See* GAIC Reply at 13-20.

In this regard, Emcor relies on the opinion of Joseph F. Gildner, President of Coastal Consulting and Adjusting, Inc., offered as an expert witness in fidelity insurance. *See* Emcor Memo at 14; Gildner Aff. ¶ 1. Emcor also relies on the *DeBra* Case, *see* note 4, *supra,* which, according to documents submitted by Emcor, involved an Emcor subsidiary that sought similar coverage under the same GAIC policies at issue here.[10] It is undisputed that the *DeBra* case was resolved by settlement. According to Emcor, GAIC admitted in the course of that case that

---

[10] According to Emcor's submissions, DeBra filed a claim arising out of employee theft that took place between 1999 and 2004, seeking coverage for its loss suffered during the period covered by the GAIC policies, as well as the FM Policy. *See* DeBra Third Party Complaint, at 25-31 (ECF 32-17); DeBra Motion for Partial Summary Judgment, at 4-7 ("DeBra Motion," ECF 32-19). DeBra initiated suit to obtain payment for the full amount of its loss. *See* DeBra Third Party Complaint ¶¶ 4-9; DeBra Motion at 18-19.

Condition 10 extended coverage as far back as the period covered by the FM Policy.  *See* Emcor Memo at 19-21.  In particular, Emcor cites an excerpt from the deposition of Thomas Maloney, GAIC's claims adjuster, provided in the *DeBra* Case, and a sentence from a brief filed by GAIC in that case.  *See id.*  Emcor also relies on the Settlement Agreement (ECF 51-2), and a letter from GAIC explaining GAIC's settlement offer (ECF 51-3), which were filed with Emcor's Surreply.

Among its contentions, Emcor also complains: "The very basis for the instant motion by GAIC, [Condition] 10, . . . was never previously identified by GAIC as a basis to limit or reduce coverage, not even in response to a specific Interrogatory asking that very question." Emcor Memo at 10; *see* Emcor Reply at 19-20.  In particular, Emcor takes issue with GAIC's response to Interrogatory No. 2 of Emcor's first set of interrogatories, in which it requested that GAIC "Identify each term and condition of the Policy that Plaintiffs failed to comply with and each term and condition of the Policy that excludes the Loss from coverage."  ECF 33-2 at 3; *see* Emcor Memo at 10.  Because GAIC did not identify Condition 10 in its response to Emcor's interrogatory, Emcor contends that GAIC has waived the arguments based on Condition 10 that are asserted in the Motion.  *See* Emcor Reply at 20.

GAIC responds that it "objected to the interrogatory in question as overly broad, because the interrogatory asked for a narrative response detailing every single fact upon which Great American relies," and also asserts that Condition 10 "was not responsive" to the interrogatory. GAIC Reply at 14-15.  Further, it states: "Emcor has never challenged [GAIC's] objection, and Great American can supplement its response pursuant to Fed. R. Civ. P. 26(e) if the objection is overruled."  *Id.*  Notably, no motion to compel was filed by Emcor with respect to GAIC's response to interrogatories.

D. *Coverage Under the 2004 Policy*

As the Fourth Circuit has observed, "determining the extent of an insured's liability for losses spanning several years or successive policies is the subject of a long and varied jurisprudence." *Spartan Iron & Metal Corp. v. Liberty Ins. Corp.*, 6 F. App'x 176, 177 (per curiam) (collecting cases).  To my knowledge, no Maryland appellate courts—or federal courts applying Maryland law—have considered the particular language at issue in regard to facts akin to those presented here.

As mentioned, in Maryland "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI*, 375 Md. at 279, 825 A.2d at 1005.  In my view, the 2004 Policy is not ambiguous.  I agree with GAIC that, by its plain language, the 2004 Policy provides coverage for losses sustained as a result of fraud during the periods covered by the 2003 and 2004 policies.  Because the 2004 Policy is not ambiguous, I decline to consider Emcor's extrinsic evidence.  And, I will deny Emcor's request for further discovery pertaining to GAIC's conduct in unrelated cases, which I have construed as a motion under Fed. R. Civ. P. 56(d).  My reasons follow.

1.  Plain Meaning of the 2004 Policy

Plaintiffs make much of the use of the words "this insurance" in portions of the 2004 Policy, rather than the words "this policy," to suggest that, through the series of consecutive policies, Emcor had continuous coverage over multiple years, which covers all of its losses.  *See* Emcor Memo at 17-18.  Plaintiffs correctly point out, for example, that Condition 10 used the words "this insurance," rather than "this policy."  And, the 2004 Policy elsewhere used the words "this policy," rather than "this insurance."  *See, e.g.*, 2004 Policy at 7 ("This policy contains all

the agreements between you and us concerning the insurance afforded.").

In particular, Emcor looks to Condition 11, captioned "Loss Covered Under This Insurance and Any Prior Insurance Issued by Us or Any Affiliate," arguing that the plain language of Condition 11 provided coverage under the earlier, successive policies issued by FM and GAIC.  *See* Emcor Memo at 8-9 ("[T]he policy clearly and unambiguously provides coverage for all of the years GAIC's policies are in effect ('This Insurance and Prior Insurance Issued by Us or Any Affiliate') . . . .").  Because the concluding paragraph of Condition 11 could refer to insurance that spans multiple years or multiple periods, Emcor insists that its coverage with GAIC necessarily spanned multiple policies.

As noted, Condition 11 stated, 2004 Police at 19:

> **11.  Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate:  If any loss is covered:**
>
>    a.   partly by this insurance; and
>
>    b.   partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;
>
>    the most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.
>
>    Regardless of the number of years **this insurance** remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.  (Emphasis added.)

Similarly, Emcor argues that the Diminution in Deductible Endorsement contemplated the possibility of coverage under successive GAIC policies.  According to Emcor, this provision applied when a loss was "sustained partly during the period of other policies providing coverage for such loss issued to the insured . . . and terminated or cancelled or allowed to expire *as of* the inception date of this policy."  2004 Policy at 53 (emphasis added).  Notably, the language of the Diminution in Deductible Endorsement differs from that of Condition 10, in that Condition 10

applied only to "prior insurance" if "this insurance became effective *at the time of* cancellation or termination of prior insurance."  Consistent with Emcor's interpretation, the endorsement seems to allocate deductibles across multiple prior policies, as opposed to a single prior policy.

Emcor insists that, if "this insurance" meant only the coverage available during a single policy period or for a single premium, both Condition 11 and the Diminution in Deductible Endorsement would have served no purpose.  And, it points out that "any construction of a contract that makes another provision superfluous is generally disfavored."  *See Nat'l Cas. Co. v Lockheed Martin Corp.*, 415 F. Supp. 2d 596, 602 (D. Md. 2006).

To be sure, the 2004 Policy did not "affirmatively indicate" that "this insurance" refers only to the 2004 Policy, rather than the series of GAIC policies collectively, as a scheme of coverage over multiple years.  *Cf. Spartan Iron*, 6 F. App'x at 177 (applying South Carolina law, finding term "occurrence" ambiguous as to multi-year coverage where policy did not "affirmatively indicate" whether a single occurrence could span successive policy years); *Glaser v. Hartford Cas. Ins. Co.*, 364 F. Supp. 2d 529, 537-38 (D. Md. 2005) (same, applying Maryland law).  Moreover, in contrast to terms used elsewhere in the 2004 Policy, such as "Policy Period," "employee," or "occurrence," all of which were expressly defined, the words "this insurance" were not defined in the 2004 Policy.  *Cf. Collier*, 327 Md. at 6, 607 A.2d at 539 (finding term "full-time student" ambiguous, stating: "Although the insurer was free, within the limits of the policy, to provide a special definition of 'full-time student' in the insurance contract, the insurer did not do so.") (Internal citation omitted).

Arguably, if the insurer intended the words "this insurance" to be coterminous with "this policy," the insurer could have defined the terms, or used the words "this policy" and "prior policy," instead of "this insurance" and "prior insurance."  But, the terms "insurance" and

"policy" are defined in the Insurance Article ("Ins.") of the Maryland Code (2011 Repl. Vol., 2012 Supp.).[11]  The words "insurance" and "policy," as used in the GAIC policies, are consistent with the statutory definitions.

Ins. § 1-101(s) defines "insurance" as "a contract to indemnify or to pay or provide a specified or determinable amount or benefit on the occurrence of a determinable contingency." The term "policy" is defined as "the written instrument in which an insurance contract is set forth," including "all clauses, endorsements, riders, and other papers attached to or made part of the insurance contract."  *Id.* § 1-101(ee).  Given these definitions, the use of the term "insurance" in Condition 10, rather than the word "policy," does not support the view that the word "insurance" referred collectively to the series of GAIC policies.  Rather, "insurance" referred to a contract for coverage, while the word "policy" referred to the written instrument that gave effect to the coverage.

Use of the word "insurance" in the 2004 Policy, as defined by statute, does not indicate an abstract accumulation of coverage under successive policies.  As noted, Condition 10 provided coverage for losses sustained during periods of "any prior insurance," so long as, *inter alia*, "this insurance" became effective at the time the prior insurance was terminated or cancelled.  2004 Policy at 20.  The "Declarations Page" of the 2004 Policy stated, *id.* at 14:

CANCELLATION OF PRIOR INSURANCE

By acceptance of this Coverage Part, you give us notice cancelling prior Policy or Bond Nos. CRP 524-49-86-01, the cancellation to be effective at the time this Coverage Part becomes effective.

---

[11] These definitions are essentially unchanged from the definitions in the Maryland Code at the time the GAIC policies were executed.  *See* Md. Code (1997 Vol.), Ins. § 1-101(t) (defining "insurance"); *id.* § 1-101(cc) (defining "policy"); Md. Code (2003 Repl. Vol.), Ins. § 1-101(s) (defining "insurance"); *id.* § 1-101(ee) (defining "policy").

The plain language of this provision specifically identified the 2003 Policy—CRP 524-49-86-01—as the "prior insurance" that was cancelled at the time the 2004 Policy took effect. Notably, the 2003 Policy was the only policy of insurance identified as cancelled or terminated upon the effective date of the 2004 Policy.

The case of *Winthrop & Weinstein, P.A. v. Travelers Casualty & Surety Company*, 187 F.3d 871 (8th Cir. 1999), is instructive.  There, the Eighth Circuit addressed a condition dealing with prior insurance, similar to the one at issue here.  The condition stated, *id.* at 876:

> [I]f you . . . sustained loss during the period of any prior insurance that you . . . could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance provided . . . (1) This insurance became effective at the time of cancellation or termination of the prior insurance . . . .

The insured sought coverage under the prior insurance condition, for losses suffered during three preceding policies held successively with a different insurance company.  *Id.*  The Eighth Circuit rejected the insured's position, because only the third of the prior policies terminated at the time that the operative policy with the defendant insurer went into effect.  *Id.*

*Adolf Jewelers, Inc. v. Jewelers Mutual Insurance Company*, 614 F. Supp. 2d 648 (E.D. Va. 2008), also provides guidance.  In that case, the insured had held successive annual policies with the insurer from 1999 to 2007, and sought coverage for loss discovered in 2007 under the then-operative policy, as well as for theft that had occurred during the term of prior policies.  *Id.* at 650.  The parties disputed an insurance condition for "Supplemental Coverage" containing language similar to the policy here.  The condition said, *id.* at 656:

> "We" will cover loss that would have been covered by the prior insurance, except that the time to discover the loss had expired, and which would be covered by this policy had it been in effect when the acts or events causing the loss or damage occurred. . . .

This supplemental coverage applies only if this Employee Dishonesty Coverage replaces prior dishonesty coverage and became effective on the expiration or termination date of the prior coverage.

Finding no ambiguity, the court concluded that "the Supplemental Coverage does not apply to policy periods other than the immediately preceding policy period." *Id.* at 657. It reasoned: "Inherently, only one policy can become effective on the expiration date of the prior coverage." *Id.*

In each of the cases discussed above, the courts concluded that language similar to that in Condition 10 of the 2004 Policy provided coverage only by way of the insurance policy immediately preceding the then-current policy. And, each court treated the word "insurance" as synonymous with the word "policy."

Condition 11 is also fully consistent with GAIC's construction, *i.e.*, that coverage existed under the 2003 Policy and the 2004 Policy. Critically, Condition 11 used conditional language. As indicated, it stated: "**If** any loss is covered . . . partly by this insurance . . . and partly by any prior cancelled or terminated insurance . . . ." In other words, Condition 11 would apply **if** "this insurance," such as the 2004 Policy, and a prior insurance policy issued by GAIC, such as the 2003 Policy, both covered a particular loss. Additionally, as GAIC observes, the concluding paragraph of Condition 11 would be given full meaning in a multi-year policy, such as the FM Policy, or a policy requiring payment of multiple premiums. *See* GAIC Reply at 10. And, contrary to Emcor's position, Condition 11 did not *grant* coverage independent of what was otherwise provided by the language of the Policy. Put simply, Emcor's reliance on Condition 11 presupposes that the GAIC policies constituted a continuous policy—the argument assumes precisely what Emcor is seeking to prove.

In addition, the Diminution in Deductible Endorsement is compatible with GAIC's

position.  As indicated, it applied where the operative policy and prior policies both covered the loss in question.  *See* 2004 Policy at 53.  Under GAIC's view, the 2003 Policy falls within the scope of this provision.  And, GAIC observes that this provision's reference to "policies" in the plural, rather than "policy" in the singular, allows for the possibility that an insured "could have had more than one policy which expired" at the inception of the operative policy.  GAIC Reply at 12.  Defendant asserts: "It is not only possible, but common, for corporations to maintain multiple fidelity insurance policies for the same period of time."  *Id.* at 7-8; *see, e.g.*, *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329-31 (4th Cir. 2008) (discussing relationship between coverage under a "primary liability insurance policy" and  an "excess insurance policy").

Further, Emcor's construction of the policies is undermined by Condition 5, a provision included in every GAIC policy at issue.  It provided that GAIC "will pay only for covered loss discovered no later than 1 year from the end of the Policy Period."  For each policy, Condition 5 allowed a one-year window to discover a loss sustained as a result of fraudulent acts that occurred during the policy period.  Thus, Condition 5 is incompatible with Emcor's position of continuous coverage across multiple policies.  *See Winthrop*, 187 F.3d at 876 (explaining that an insurer for three successive policies, each with a one-year discovery window, "would not be liable for period one and two losses [discovered during the third policy's discovery window], as those losses are outside the respective discovery windows"); *Am. Auto Guardian, Inc. v. Acuity Mut. Ins. Co.*, 548 F. Supp. 2d 624, 627 (N.D. Ill. 2008) ("Each of the [] policies covered a distinct policy period, and the termination of each policy period started a new one-year discovery period ticking.").

The language of the 2004 Policy unambiguously supports GAIC's interpretation that the coverage is available only under the 2003 Policy and the 2004 Policy. Emcor's expansive view of coverage lacks a sound basis in the language of the policies as a whole.

### 2. Character and Purpose of the GAIC Policies

In resolving the parties' dispute, it is also useful to consider "'the character of the contract[s], [their] purpose, and the facts and circumstances of the parties at the time of execution.'" *Riley*, 393 Md. at 79, 899 A.2d at 833 (quoting *Chantel Assocs.*, 338 Md. at 142, 656 A.2d at 784); *see Pac. Indemn. Co.*, 302 Md. at 388, 488 A.2d at 488; *see, e.g., Spartan Iron*, 6 F. App'x at 179-80 (considering whether the parties intended coverage "by means of one continuous policy" or a series of "separate and independent contract[s]"); *Glaser*, 364 F. Supp. 2d at 538 (same). In my view, the character and purpose of the policies, which provided coverage on a "loss sustained" basis, *see* GAIC Reply at 3 n.1; Emcor Reply at 9, would be undermined if I were to adopt Emcor's position. Interpreting the GAIC policies as providing for continuous insurance would eviscerate the clear temporal limitations imposed by the express one-year discovery window set forth in Condition 5, applicable to each GAIC policy, *see* GAIC Reply at 3-5, and could transform a "loss sustained" policy into an "occurrence" policy.

A "loss sustained" policy is the form of policy that has historically been used in providing fidelity insurance coverage. *See Se. Bakery Fees, Inc. v. Ranger Ins. Co.*, 974 S.W.2d 635, 639-40 (Mo. Ct. App. 1998) (citing Paul R. Devin & Lauren D. Song, *Loss and Causation: The Alpha and Omega of Fidelity Claims Analysis*, COMMERCIAL CRIME POLICY 15-16 (Gilbert J. Schroeder, ed., 1997)); *see also Pine Belt Auto., Inc. v. Royal Indem. Co.*, No. Civ. A. 06-5995 JAP, 2009 WL 1025564, at *4 (D.N.J. Apr. 16, 2009). It represents a hybrid of a "claims made" policy and an "occurrence" policy:

> "Generally speaking, 'occurrence' policies cover liability inducing events occurring during the policy term, irrespective of when an actual claim is presented.   Conversely, 'claims made' (or 'discovery') policies cover liability inducing events if and when a claim is made during the policy term, irrespective of when the events occurred."

*St. Paul Fire & Marine Ins. Co. v. House*, 315 Md. 328, 332, 554 A.2d 404, 406 (1989) (quoting

*Mut. Fire, Marine & Inland Ins. Co. v. Vollmer*, 306 Md. 243, 252, 508 A.2d 130, 134 (1986)).

A loss sustained policy "exhibit[s] features of both occurrence and claims made plans in that losses attributed to criminal acts are generally indemnified if they occur and are discovered during a stated policy period."   *Gray & Assocs., LLC v. Travelers Cas. & Sur. Co. of Am.*, Civil Action No. CCB-07-2216, 2008 WL 822130, at *4 (D. Md. Mar. 25, 2008) (citing *Bakery Feeds*, 974 S.W.2d at 639-40)).   In other words, "[w]hile [a loss sustained policy] covers losses sustained through acts committed or events occurring during the policy period, like an occurrence policy, it only covers those covered losses which have been discovered during a fixed period," like a claims made or discovery policy.   *Bakery Feeds*, 974 S.W.2d at 639-40.

The discovery limitations in loss sustained policies—here, Condition 5—serve several important purposes from the perspective of the insurer.   "Because discovery clauses limit an 'insurer's liability to losses discovered within a fixed period,' [they] provid[e] predictability to an insurer's exposure . . . ."   *Gray & Assocs.*, 2008 WL 822130, at *4.   "Moreover, discovery clauses serve as 'a safeguard to the insurer, imposing upon the insured a reasonable effort to monitor its employees' work and faithfulness,' and 'allow the surety to avoid having to investigate stale claims.'"   *Id.* (quoting *Bakery Feeds*, 974 S.W.2d at 639-40).   As a result, discovery clauses "must be 'strictly enforced."   *Id.* (quoting *Bakery Feeds*, 974 S.W.2d at 640).

For example, in *Karen Kane Inc. v. Reliance Insurance Company*, 202 F.3d 1180, 1188-89 (9th Cir. 2000), involving a coverage dispute for employee theft under three successive one-

year policies, the Ninth Circuit addressed whether coverage under the third policy extended to losses sustained, but not discovered, during the first policy.[12]   Like the policies at issue here, each policy in *Karen Kane* included a one-year discovery clause providing that the insurer "will pay only for covered loss discovered no later than one year after the end of the policy period." *Id.* at 1188.   But, the loss was discovered more than one year after the end of the first policy period.   *Id.*   The insured argued that the one-year discovery clause was inconsistent with other provisions, and that it should have been "tolled" to permit discovery during the third policy period.

Rejecting the insured's position, the Ninth Circuit said: "The language of the one-year discovery rule is quite plain and would appear to apply in a straightforward fashion. . . . [I]nsurance companies are free to place limits upon the coverage of the policies they issue."   *Id.* Explaining that "tolling" was not appropriate, the court stated, *id.* at 1188-89:

> First, allowing for tolling would effectively read the one-year discovery provision out of the policy. The parties explicitly agreed that Reliance would pay only for covered loss *discovered* no later than one year *from the end of the policy period*. If the *one-year discovery period itself* were tolled until discovery of loss, the discovery provision's express limitation on coverage would be rendered meaningless.

The Ninth Circuit's observations are equally salient here.   Condition 5 plainly stated that GAIC "will pay only for covered loss discovered no later than 1 year from the end of the Policy Period."   2004 Policy at 17.   The Policy Period was set forth in the 2004 Policy Declarations, which expressly stated that the policy period was "12/01/04 to 12/01/05."   *Id.* at 14.

Here, the losses for which Emcor seeks coverage occurred during prior policy periods, and were not known to Emcor until *after* the discovery window for those policies had expired. To adopt Emcor's position, the policy limitations would be read straight out of the GAIC

---

[12] The trial judge decided the issue as a matter of law.   *Karen Kane*, 202 F.3d at 1183.

policies.  In effect, for Emcor to recover for the lengthy period of fraudulent employee conduct, the Court would have to disregard Condition 5, Condition 14, the Declarations, as well as the comparable discovery provisions of both the 2002 and 2003 policies.  When a contract is clear and unambiguous, a "court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck." *Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443, 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam); *Caloramis v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) ("It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'") (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)).  Furthermore, taken to its logical extreme, GAIC would be subjected indefinitely to liability for losses sustained during any period of its coverage, no matter how old, as long as the parties continue their relationship.  Emcor has offered no limiting principle to explain how or when the extent of this liability would terminate.

To be sure, courts have occasionally construed fidelity bonds as providing for continuous insurance, thereby allowing recovery for losses sustained during earlier periods of coverage.  For example, in *Leonard v. Aetna Casualty & Surety Company*, 80 F.2d 205 (4th Cir. 1935), a case the parties did not discuss, the Fourth Circuit held that the terms and conditions of a fidelity bond indicated that "only one contract was effected by the parties," although the bond was renewed by annual premiums.  *Id.* at 205-06.  In that case, the insured, a bank, paid annual premiums on the bond between 1925 and 1933, to cover the conduct of a bookkeeper.  *Id.* at 205.  In January 1933, the bank discovered losses from the bookkeeper's fraud, which took place between August 1930 and January 1933.  *Id.*  The bank sought three payments up to the limit of the bond, one for

each year in which the bond was in effect, on the theory that a new contract came into existence with the payment of each annual premium.  *Id.*[13]

Rejecting this argument, and construing the bond as a single continuous contract, the Fourth Circuit reasoned, *id.* at 206 (footnote omitted):

> The question at issue is to be decided by determining whether the parties contemplated a single continuous contract covering the entire period, or a series of independent contracts, each for the period of one year; and the solution necessarily depends upon the terms of the bond.  It will be noticed in the first place that the instrument did not specify a definitely limited period terminating on a certain date, with the privilege of renewal,[ ] but covered the period commencing on August 17, 1925, and continuing until the suretyship was terminated by affirmative action, that is, by notice of termination by one of the parties to the contract, by retirement of the employee from the service, or by the discovery of loss. Secondly, no additional agreement was needed to extend the period of the coverage of the bond. It is true that an annual premium was to be paid by the bank, but this provision did not limit the period of the contract; it merely described the consideration running to the surety. There was no requirement for the renewal of the bond upon payment of the annual amount, and no stipulation that liability should cease if the annual premium should not be paid. Finally, the limitation upon the liability of the surety as to each year of the period did not become effective with regard to the expiration of the year, but only with regard to the expiration of one continuous term; for the fourth paragraph of the bond, quoted above, provided that the surety should be liable for losses discovered during the term of the bond 'or within two years after termination thereof.'

Similarly, in *Reliance Insurance Company v. IRPC, Inc.*, 904 A.2d 912 (Pa. Super. Ct. 2006), the Superior Court of Pennsylvania held that multiple successive fidelity bonds, issued over several years, represented a continuous insurance scheme, subject to a single limit, rather than multiple contracts.  In that case, the insured executed the original one-year bond, and then "executed endorsements renewing the policy for consecutive one-year terms."  *Id.* at 916. Notably, the insurer "did not issue separate bond instruments."  *Id.*   Additionally, the bond included language similar to Condition 11, to the effect that "regardless of how long the policy remained in force or how many premiums were paid, 'no limit of insurance accumulates from

---

[13] The district court decided the issue as a matter of law.  *Aetna*, 80 F.2d at 206.

year to year or period to period.'"  *Id.*  As a result, the court concluded that "the parties entered into a continuous bonding scheme."  *Id.*

Yet, each of these cases is distinguishable from the facts in the case *sub judice*.  In *Aetna*, 80 F.2d at 206, "the instrument did not specify a definitely limited period terminating on a certain date," and "no additional agreement was needed to extend the period of the coverage of the bond."  Moreover, the bond in *Aetna* limited liability to losses during "one continuous term," and did not define the "term."  *Id.*  In *Reliance*, the insured executed annual "endorsements renewing the [original] policy," as opposed to executing "separate bond instruments."  904 A.2d at 916.  In contrast, each GAIC policy included an express limitation on the period of coverage; each policy was expressly terminated when the new GAIC policy took effect; and, rather than "extending" or "renewing" a policy, the parties executed an entirely new policy, with new terms, that expressly cancelled the prior one.  *Cf. Am. Auto Guardian*, *supra*, 548 F. Supp. 2d at 629 ("If the renewals were meant only to continue the existing coverage, simply extending the termination date would have been sufficient.  Instead each renewal carved out a distinct one year period of effectiveness.").  In view of the language of the policies at issue, and construing the character of the GAIC policies as a whole, the temporal limitations in the policies could not be clearer.

The parties discuss extensively the Fourth Circuit's opinion in *Spartan Iron*, *supra*, 6. F. App'x 176, as well as the analysis in *Glaser*, *supra*, 364 F. Supp. 2d 529.  *See* Emcor Memo at 8-9, 11-14; GAIC Reply at 3-4.  In my view, these cases are distinguishable, because they address the meaning of the word "occurrence," as opposed to Condition 5 or Condition 10.  And, in any event, Emcor's position is not supported by either decision.

In *Spartan Iron*, the Fourth Circuit considered whether the term "occurrence," defined in the operative insurance policies as "all loss caused by, or involving, one or more 'employees,' whether the result of a single act or a series of acts," should be read to cover acts occurring over the course of successive policy years, or, instead, should be limited to acts occurring in a single policy period.  6 F. App'x at 177-78.  In that case, the insured claimed a loss for employee fraud that extended over two successive policy periods, and the amount of loss in each period exceeded the $100,000 per occurrence limit of the insurance policy then in effect.  *Id.* at 177.  The insured had submitted a claim for $200,000, seeking $100,000 in coverage under each policy.  *Id.*  But, the insurer limited the amount of coverage to $100,000—the per occurrence limit for a single policy—claiming that the fraud in question constituted a single "occurrence," and that the insured could only recover under one policy.  *Id.*  The insured sued for the unpaid portion of the claim.  *Id.*

Applying South Carolina law, the Fourth Circuit approached the issue from two perspectives: first, "as a simple matter of contract interpretation," and second, by considering "whether the parties intended coverage through one continuous contract or a series of independent contracts."  *Id.*  As a matter of contract interpretation, the Court found the definition of "occurrence" ambiguous as to whether it encompassed acts occurring outside the policy period, because it did not "affirmatively indicate" a temporal limitation.  *Id.*  As plaintiffs note, the Court said that language similar to that in Conditions 10 and 11 "did not ameliorate the ambiguity in the definition of occurrence."  *See id.* at 179.  The Court reached the same conclusion after considering whether the parties intended each policy to be a "separate and independent contract," albeit in a series of successive policies, or whether coverage was instead provided "by means of one continuous policy."  *Id.* at 179-80.

The Court's "review of the [two] policies indicate[d] they were intended as separate and independent contracts, in that each required a separate, single annual premium to be paid at its 'inception.'" *Id.* at 180.   In addition, the Court examined a condition indicating that the parties were "to specify which, if any, prior policies or bonds are to be cancelled" when the new policy became effective, *id.*, and a condition that, similar to Condition 14 in the 2004 Policy, provided that the insurer would pay only for "loss [sustained] through acts committed or events occurring during the policy period." *Id.*   These conditions suggested that the parties viewed successive policies as independent, rather than continuous.   *See id.*   Thus, the Fourth Circuit held that coverage was "properly construed as being provided through successive and independent contracts for insurance," and the insured could "recover up to the limit of insurance under each policy in effect during the time the employee dishonesty in question took place." *Id.* at 181.

In *Glaser*, 364 F. Supp. 2d 529, Judge Bennett considered a similar dispute under Maryland law.   In that case, the insured procured five successive policies with the same insurer over the course of five years, each of which provided coverage for employee dishonesty up to a per occurrence limit of $25,000. *Id.* at 531.   The insured suffered losses from fraud committed by an employee over the course of three years, during which the policies were in effect. *Id.* at 531-32.   The insured sought to recover $97,606.72, for what it characterized as seven separate losses. *Id.* at 531-32.   However, the insurer only tendered payment for $25,000, on the ground that the employee's fraud, though it spanned three policy years, constituted a single "occurrence." *Id.*   at 532.   The dispute thus presented the question of whether the insurer was responsible for coverage up to the per occurrence limit for each policy year, or only for a total of $25,000 across all policy years. *Id.* at 534.

As in *Spartan Iron*, "occurrence" was defined as "all loss caused by, or involving, one or more 'employees,' whether the result of a single act or a series of acts." *Id.* at 537.  Persuaded by the reasoning of the Fourth Circuit in *Spartan Iron*, Judge Bennett found the policy ambiguous as to whether coverage for each "occurrence" encompassed events occurring only within the period of the policy then in effect. *See id.* at 537-38.  He agreed that the "'policy terms . . . concerning non-cumulation,'" such as Condition 11, and "the effect of prior insurance coverage," such as Condition 10, "'did not ameliorate the ambiguity in the definition of occurrence.'" *Id.* (quoting *Spartan Iron*, 6 F. App'x at 179).  However, the insured's "five successive policies required different premiums to account for varied levels of coverage over different property, all of which indicate[d] that each policy was independent." *Glaser*, 364 F. Supp. 2d at 538.  Relying on *Spartan Iron*, Judge Bennett resolved the ambiguities in favor of the insured, and found that recovery was permitted under each policy during which the employee's fraudulent acts occurred—in other words, that the fraud constituted a separate occurrence for each policy period. *See id.*

Emcor contends that the GAIC policies include certain terms—namely, Conditions 10 and 11—that *Spartan Iron* and *Glaser* said "did not ameliorate the ambiguity in the definition of occurrence," *see supra*, and therefore I must find those conditions ambiguous here. *See* Emcor Reply at 6-8.  But, *Spartan Iron* and *Glaser* considered the meaning of those terms with respect to a narrow issue: the temporal limitations on "occurrence" for purposes of liability limits.  They did not address whether Condition 10 grants coverage only for the immediately preceding policy, or consider Condition 5, which is particularly pertinent here.  Importantly, "[a] term which is clear in one context may be ambiguous in another." *DeHaan*, 393 Md. at 194, 900 A.2d at 226).  By asking this Court to rely on *Spartan Iron* and *Glaser*, Emcor would have the Court re-write

the unambiguous language of Conditions 5, 10 and 14, based on ambiguity in "occurrence."  As the court explained in *Adolf Jewelers*, *supra*, 614 F. Supp. 2d at 657:

> The contract clearly says—and there is no disagreement regarding this clause—that JMIC only pays for those losses "that occur within the policy period."  If this Court grants coverage based on losses that occur outside the policy period because the word "occurrence" is ambiguous, this directly contradicts the temporal language of the current policy.

In any event, I note that several factors material to the decisions in *Spartan Iron* and *Glaser*, in which the courts construed successive policies as separate and independent contracts, are also present here.  In particular, Emcor paid separate premiums at the "inception" of each policy and changed several policy terms.  *See Spartan*, 6 F. App'x at 179-80 ("Our review of the Liberty Policies indicates that they were intended as separate and independent contracts, in that each required a separate, single annual premium to be paid at its 'inception.'"); *Glaser*, 364 F. Supp. 2d at 538 ("To interpret successive policies [as a single policy] . . . would essentially render the [discrete] coverage of successive policies and the payment of premiums meaningless.").  Each GAIC policy also included a "Cancellation of Prior Insurance" provision, terminating the prior policy upon the effective date of the new policy.  *See Spartan Iron*, 6 F. App'x at 180.  And, in considering the language of Condition 14, *Spartan Iron* endorsed the view that "this provision has the effect of severing the series of acts constituting an occurrence at the termination date of a policy, thereby permitting recovery under successive policies as the acts of employee misconduct continued."  *Id.*  The Fourth Circuit said: "[T]his language supports the argument that [the insured's] policies with [the insurer] were intended as successive and independent one-year contracts for coverage . . . ."  *Id.*  The same conclusion is appropriate here.

In sum, considering the 2004 Policy independently and the GAIC policies collectively, the 2004 Policy unambiguously covered loss sustained as a result of acts or occurrences during

the Policy Period, including losses discovered within one year following the end of the policy. And, Condition 10 unambiguously extended coverage to the 2003 Policy. Because the language is unambiguous, I must resolve the meaning of Condition 10 as a matter of law, in favor of GAIC. *Cole*, 359 Md. at 305, 753 A.2d at 537. Accordingly, it is not appropriate to consider Emcor's extrinsic evidence.[14] *Cole,* 359 Md. at 305, 753 A.2d at 537 (stating that a court may consult "extrinsic sources" to ascertain the meaning of a policy term only where the term is ambiguous).

E. *"Evidence" from the* DeBra *Case*

As noted, Emcor filed its Surreply as this Opinion was about to be issued, well over three months since the last filing pertinent to the parties' motions.[15] In the Surreply, Emcor identified

---

[14] In any event, the extrinsic evidence offered by Emcor is hardly illuminating. Mr. Gildner opined that "the Great American policy provided coverage for losses that occurred throughout the continuous coverage issued by Great American from December 1, 2002, as well as all losses that occurred under the Factory Mutual coverage." Gildner Aff. ¶ 6. But, Mr. Gildner, who was not involved with execution of the policies in this case, cannot opine on how *these parties* understood the GAIC policies. *See, e.g., Schneider v. Continental Cas. Co.*, 989 F.2d 728, 732 n.3 (4th Cir. 1993). Nor does Maryland permit expert testimony to aid in construction of a contract unless a term carries "'a peculiar meaning in a trade, business or profession.'" *Truck Ins.*, 288 Md. at 434, 418 A.2d at 110 (citation omitted).

Moreover, the treatise excerpts relied upon by Mr. Gildner are not inconsistent with GAIC's position. For example, one treatise states that Condition 10 "[e]xtends coverage to losses that would have been covered under a prior policy except for the expiration of the previous policy's discovery period," and "without such a provision, a loss that occurred during a previous policy period would be uninsured if it were not discovered until that policy had terminated and its discovery period had expired." ECF 32-13 at XII.D.5-6. But, the treatise refers to the preceding "policy," not the preceding "insurance," and GAIC's understanding extends coverage to the preceding policy.

[15] Emcor insists that it just obtained the parties' Settlement Agreement, and information as to the settlement negotiations, because GAIC only recently produced the settlement documents from the *DeBra* Case. *See* Surreply Motion at 1-2. The notion that Emcor did not have these particular documents in its possession, or access to them, is puzzling. As Emcor takes great pains to point out, DeBra-Keumpel was an Emcor subsidiary that held coverage under the same GAIC policies at issue here. Further, counsel for DeBra-Keumpel in the *DeBra* Case, Oliva & Associates, ALC, is also counsel for Emcor in this case, and GAIC's settlement offer in

two documents pertaining to the settlement in the *DeBra* Case that, in its view, "demonstrate[] that EMCOR's interpretation of the policy is the correct one." Surreply Motion at 2; *see generally* Surreply at 1-3. In particular, it submitted a copy of the Settlement Agreement between GAIC and DeBra, dated September 30, 2008, *see* ECF 51-2 (the "Settlement Agreement"), and a letter of March 13, 2007, from GAIC's counsel in the *DeBra* case, discussing the basis for GAIC's settlement offer. *See* ECF 51-3 (the "Offer Letter").

The Settlement Agreement stated, in part, at ¶ A:

> A.   From December 1, 2002 through December 31, 2006, CLAIMANT was insured under a policy of insurance issued by the GREAT AMERICAN [Insurance Company] bearing policy numbers CRP 524-49-86-00; CRP 524-49-86-01; CRP 524-49-86-02; and CRP 524-49-86-03 (hereinafter, "THE POLICY"), which provided employee dishonesty coverage, among other things.

According to Emcor, the Settlement agreement "makes it explicit that GAIC agreed to provide EMCOR with continuous coverage for all of the years GAIC provided Fidelity insurance." Surreply at 2. It also asserts that "GAIC conceded that the various policy forms it issued all worked together to provide coverage under 'a' policy of insurance for all of the years that it was on the risk – 'From December 1, 2002 through December 31, 2006.'" *Id.*

The Offer Letter stated, in part, at 2: "Great American's position is that for the time period of its policy, 12/1/02 to 12/1/04 . . . ." Emcor claims that the Offer Letter "also appends a chart from GAIC's accountant which depicts Great American's damages position as to the amount of the loss incurred by year, ranging from November 1999 (the time frame of the Factory Mutual policy) through November 30, 2004 (two years of GAIC coverage), a five-year span."

---

the *DeBra* case was sent to Oliva & Associates. Thus, it seems surprising that such documents were not in Emcor's possession. Nor did Emcor provide any explanation as to how such important documents were otherwise unavailable from its own files.

Surreply at 2.   Emcor maintains that "[t]his is incompatible with a two (2) year coverage limitation" that GAIC has asserted in this case, under the identical policies.   *Id.*

Thus, Emcor insists that GAIC's position in this case is contrary to its position in the *DeBra* Case.   Relying on Maloney's deposition testimony, the Settlement Agreement, and the Offer Letter, it maintains that GAIC is bound by its admission in the *DeBra* case that Emcor's uninterrupted coverage under the GAIC policies is continuous, and extends back to the FM Policy.

Emcor may not rely on GAIC's settlement of the *DeBra* Case to judicially estop GAIC from taking a purportedly contrary position in this litigation.   "Judicial estoppel is a principle developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court." *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007). The Fourth Circuit has cautioned: "Because of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996).   Although courts formulate the elements judicial estoppel in varying ways, at minimum, three conditions must be met for a party to invoke judicial estoppel: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation," which, notably, "must be one of fact rather than law or legal theory"; (2) "the prior inconsistent position must have been accepted by the court" in the prior litigation; and (3) "the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.'" *Id.* at 223-24.

The *DeBra* Case was resolved by settlement.   Judicial estoppel does not apply if "no court ever adopted the original . . . position." *Masayeva ex rel. Hopi Indian Tribe v. Hale*, 118 F.3d 1371, 1382 (9th Cir. 1997); *see Lowery*, 92 F.3d at 224 ("The insistence upon a court

having accepted the party's prior inconsistent position ensures that judicial estoppel is applied in the narrowest circumstances."); *cf. Israel v. Chabra*, 601 F.3d 57, 65 n.2 (2d Cir. 2010) ("[I]n the absence of circumstances requiring us to apply judicial estoppel, our role in interpreting a contract is to give effect to the intent of the parties at the time of the contract's making, not the position they found it necessary to adopt during litigation.").

As noted, Emcor also relies on Maloney's deposition testimony in the *DeBra* case, characterizing Maloney's statements as binding "admissions" made by an authorized agent of Emcor.  *See* Emcor Memo at 15-16; Reply at 16-20.  Defendant disputes that Maloney testified as an authorized agent.  GAIC Reply at 15-16.  In the absence of ambiguity in the GAIC policy language, any factual dispute as to Maloney's status as an agent of GAIC is not material.[16]

Moreover, as GAIC points out in its Reply, when Maloney's deposition testimony in the *DeBra* Case is read in context, it could easily be understood as consistent with GAIC's position here.  *See* GAIC Reply at 16-17.  Indeed, Maloney identified Condition 10 as extending coverage to "the prior expiring policy."  *See* ECF 32-19.  Thus, Maloney's testimony does not plainly assist plaintiffs.  In any event, because the 2004 Policy is not ambiguous, the interpretation of Maloney's statement is not a matter for consideration by the fact finder.  *See Wash. Metro. Area Transit Auth.*, *supra*, 476 F.3d at 235.

In addition, the documents from the settlement of the *DeBra* Case are inadmissible under Federal Rule of Evidence 408, and cannot be considered for purposes of summary judgment. Under Fed. R. Civ. P. 56(c), "[t]o be entitled to consideration on summary judgment, the facts set

---

[16] If the 2004 Policy were ambiguous, plaintiffs' evidence would arguably constitute "an interpretation of the term employed by one of the parties before the dispute arose."  *Cole*, 359 Md. at 305, 753 A.2d at 537; *see Pac. Indem.*, 302 Md. at 389, 488 A.2d at 489 ("Construction of the contract by the parties to it before the controversy arises is an important aid to interpretation of uncertain terms.").

forth by the parties in affidavits or otherwise must be such as would be admissible in evidence."

*Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999), *aff'd*, 213 F.3d 632

(4th Cir. 2000) (citing Fed. R. Civ. P. 56(c)); *see Toll Bros., Inc. v. Dryvit Sys., Inc.*, 432 F.3d

564, 568 (4th Cir. 2005) ("Summary judgment is warranted when the *admissible* evidence

forecasted by the parties demonstrates that no genuine issue of material fact exists and that the

moving party is entitled to judgment as a matter of law.") (emphasis added).

F.R. Evid. 408, titled "**Compromise Offers and Negotiations,**" governs the

admissibility of settlement negotiations and agreements.  It provides:

> **(a) Prohibited Uses.**  Evidence of the following is not admissible—on behalf of
> any party—either to prove or disprove the validity or amount of a disputed claim
> or to impeach by a prior inconsistent statement or a contradiction:
>
> > (1) furnishing, promising, or offering—or accepting, promising to accept,
> > or offering to accept—a valuable consideration in compromising or
> > attempting to compromise the claim; and
> >
> > (2) conduct or a statement made during compromise negotiations about the
> > claim—except when offered in a criminal case and when the negotiations
> > related to a claim by a public office in the exercise of its regulatory,
> > investigative, or enforcement authority.
>
> **(b) Exceptions.**  The court may admit this evidence for another purpose, such as
> proving a witness's bias or prejudice, negating a contention of undue delay, or
> proving an effort to obstruct a criminal investigation or prosecution.

The 1972 Advisory Committee Note to Rule 408 indicates that settlement negotiations

and agreements are inadmissible for two reasons: "(1) The evidence is irrelevant, since the offer

may be motivated by a desire for peace rather than from any concession of weakness of position.

. . .  (2) [P]romotion of the public policy favoring the compromise and settlement of disputes."

Fed. R. Evid. 408 advisory committee note (1972).  The Advisory Committee Note also states:

"While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a

similar attitude must be taken with respect to completed compromises when offered against a

party thereto.  The latter situation will not, of course, ordinarily occur except when a party to the present litigation has compromised with a third person."  *Id.*

*Fiberglass Insulaters, Inc. v. Dupuy*, 856 F.2d 652, 653-55 (4th Cir. 1988), is instructive as to the admissibility, under Rule 408, of the settlement of a related dispute between parties. *Dupuy* concerned a lawsuit between two former business associates arising out of the dissolution of a business association, which was "but the latest manifestation" of several disputes concerning the business.  *Id.* at 653.  The parties had already been involved in "five or six cases," each of which had been resolved by settlement.  *Id.*  The Fourth Circuit considered the admissibility of statements made by the defendant's attorney during settlement negotiations concerning the prior cases, which the plaintiff sought to introduce to establish the defendant's liability for anti-competitive behavior.  *See id.* at 653-54.

Holding that the district court had correctly excluded the evidence under Rule 408, the Court reasoned: "The public policy of favoring and encouraging settlement makes necessary the inadmissibility of settlement negotiations in order to foster frank discussions."  *Id.* at 654. Moreover, even though the case presented antitrust claims that had not been at issue in the prior cases, the Court recognized that "the 'spectre of a subsequent use to prejudice a separate and discrete claim is a disincentive which Rule 408 seeks to prevent.'"  *Id.* (quoting *Branch v. Fidelity & Cas. Co. of N.Y.*, 783 F.2d 1289, 1294 (5th Cir. 1986)).  The Court was further persuaded that, because each case arose "out of the same transaction, *i.e.*, the breakup of the business association," the "strong public policy favoring exclusion" carried substantial weight. *Dupuy*, 856 F.2d at 655; *see Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 298-99 (5th Cir. 2010) (holding that Rule 408 barred admission of settlement negotiations concerning a separate claim that arose out of the same events, involved the same parties, and raised the same

liability question as the claim being litigated, because "the offering of settlement evidence arising out of a shared factual nexus and bearing directly on present issues of liability between many of the same parties falls within Rule 408's prohibition," and stating: "Making the content of such a discussion available for use in related litigation would invite the very situation that Rule 408 is designed to avoid . . . ."); *Lo Bosco v. Kure Eng'g Ltd.*, 891 F. Supp. 1035, 1038 (D.N.J. 1995) ("[W]here cases are related, the better view is that Rule 408 may exclude settlement proposals in one from admission into evidence in the other."); *see also Hudspeth v. Comm'r of Internal Revenue Serv.*, 914 F.2d 1207, 1213 (9th Cir. 1990) ("Rule 408 does apply to situations where the party seeking to introduce evidence of a compromise was not involved in the original compromise.").

Cases cited by *Dupuy*, 856 F.2d at 654, also illustrate the reach of Rule 408. *See, e.g.*, *United States v. Contra Costa Cnty. Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1980) (holding inadmissible a settlement by plaintiff with another defendant of a closely related, but separate claim); *Branch v. Fidelity & Cas. Co. of N.Y.*, 783 F.2d 1289, 1294 (5th Cir. 1986) ("The admission of the settlement agreement [between defendant and a third party] into evidence, and the use made of that evidence, violated both the letter and spirit of Rule 408.").

Under *Dupuy*, the Settlement Agreement and Offer Letter fall squarely within the ambit of Rule 408, as evidence of a settlement in a separate, but closely related dispute. The policies at issue here are the same policies as those at issue in the *DeBra* Case. Further, the two cases concern similar disputes over coverage, between the same parties (or, in Emcor's case, a subsidiary). Permitting Emcor to use the Settlement Agreement and Offer Letter to establish the extent of GAIC's liability in this case would undermine the strong public policy favoring settlement. *See Dupuy*, 856 F.2d at 654. Indeed, if the terms of GAIC's settlement were

admissible here, then the settlement of one claim under the GAIC policies could potentially be used to establish GAIC's liability in any analogous claim made by a similarly situated GAIC policy holder.

Additionally, I am not persuaded that the *DeBra* settlement is probative.  As the Advisory Committee Note to Rule 408 indicates, settlement can be "motivated by a desire for peace rather than from any concession of weakness of position."  Fed. R. Evid. 408 advisory committee note (1972); *see, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007) ("[T]he threat of discovery expense will push cost-conscious defendants to settle even anemic cases."); *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, Civil Action No. DKC 10-3517, 2011 WL 3476994, at *9 (D. Md. Aug. 8, 2011) ("[P]arties settle for a myriad of reasons too numerous to describe in detail here. . . .  As one court recognized more than one hundred years ago, '[i]t costs time, trouble and money to defend even an unfounded claim.  Parties have a right to purchase their peace.'") (quoting *Ga. Ry. & Elec. Co. v. Wallace & Co.*, 50 S.E. 478, 480 (Ga. 1905)).  GAIC's decision to settle, and the terms of the settlement, could have been driven by any number of reasons, and do not demonstrate that Emcor's view is correct as a matter of law.

F. *Discovery and Waiver*

As noted in its submissions, Emcor raised issues related to discovery and waiver.  First, Emcor asserts that GAIC's Motion is "premature," and that, before the Court renders any decision, Emcor is entitled to conduct discovery, pursuant to Fed. R. Civ. P. 56(d), "on whether GAIC has ever previously taken the position it is taking on this instant motion."  Emcor Memo at 32; *see* Emcor Reply at 19.   Second, Emcor contends that GAIC waived its "defense" to coverage by failing to articulate Condition 10 as the basis for its position in responses to Emcor's interrogatories.  *See* Emcor Reply at 10.

The discovery sought by Emcor does not warrant deferring partial summary judgment here.  Fed. R. Civ. P. 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a motion for summary judgment, "the court may: (1) defer consideration of the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  An affidavit under Fed. R. Civ. P. 56(d) must identify, with specificity, the reasons that the party is unable to justify its opposition.

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'"  *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb.14, 2011)).  "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted); *see Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 683 F.3d 539, 559-60 (4th Cir. 2012) (holding district court correctly denied further discovery because party requesting extension "ha[d] been unable to point to any item of discovery or fact that would have assisted the district court in addressing the issues").  A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam).

Here, Emcor asserts that "Plaintiffs should be afforded the opportunity to conduct additional discovery on whether GAIC has ever previously taken the position it is taking in the instant motion and whether GAIC has ever paid claims covering several years in policies containing the same language."  Emcor Reply at 19.  Plaintiffs also indicate that they have "schedul[ed] the deposition of the GAIC underwriter, Dennis Burns, who will be able to testify about the intent of the policy."  *Id.*[17]

However, neither of these particular discovery requests—both of which concern extrinsic evidence—warrants a deferral of the instant motions.  In my view, Emcor seeks "discovery for the sake of discovery," *Hamilton*, 807 F. Supp. 2d at 342, and any additional evidence "would not . . . by itself create[] a genuine issue of material fact sufficient to defeat summary judgment." *Strag*, 55 F.3d at 954.  Where the terms of an insurance policy are unambiguous, "'a court has no alternative but to enforce those terms.'"  *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta,* 363 Md. at 557, 556 A.2d at 1138).

I have concluded that the 2004 Policy unambiguously extended coverage only to the 2003 Policy period.  Having found the plain language unambiguous, the extrinsic evidence identified by Emcor would not be material to the Court's interpretation of the 2004 Policy.  Therefore, Emcor's request for additional discovery does not merit relief from judgment under Fed. R. Civ. P. 56(d).

Additionally, Emcor complains that GAIC failed to identify the basis for its defense to coverage before GAIC filed its Motion.  As noted, GAIC did not provide a coverage opinion.

---

[17] The deposition of Dennis Burns "was scheduled for November 5, 2012 . . . but was adjourned due to Hurricane Sandy."  Emcor Reply at 19 n.10.  There is no indication in the record as to whether the deposition has, in fact, been taken.  However, Emcor has had the opportunity to take the deposition of Thomas Maloney, GAIC's claims adjuster, and it relied on that deposition in its reply brief.  Accordingly, that particular discovery request is moot.

And, Emcor takes issue with GAIC's response to Interrogatory No. 2 in Emcor's first set of interrogatories. That interrogatory provides, ECF 33-2 at 3:

> State the facts Concerning the matters alleged in Your Third Defense in Your Answer that the Complaint "is barred because plaintiffs failed to comply with the terms and conditions of the policy, and/or because the alleged loss is not covered by the policy" and Identify each term and condition of the Policy that Plaintiffs failed to comply with and each term and condition of the Policy that excludes the Loss from coverage, Describe the basis for Your contention and Identify all Persons with knowledge supporting your contention.

GAIC objected to the interrogatory "to the extent that it seeks the mental impressions and/or trial strategy of counsel," "to the extent that it seeks information which is protected by the attorney-client privilege and/or the work product doctrine," and "as overly broad and unduly burdensome." *Id.* GAIC did, however, provide a substantive response. It asserted, *inter alia*, that pursuant to Condition 14, "the policy sued upon does not cover loss resulting from fraudulent actions which occurred prior to December 1, 2004." *Id.* at 4. And, relying on Condition 11, GAIC stated: "[T]o the extent that part of the alleged loss may be covered by any prior insurance policy [issued by GAIC], Great American's liability is limited to the larger amount recoverable under the policy sued upon or the prior policy." *Id.*

However, GAIC did not identify Condition 10 as a condition "that excludes the Loss from coverage." Consequently, Emcor states in its Reply brief: "GAIC never once advised EMCOR that it was going to interpret the policy the way it had not done before and would attempt to limit coverage on this basis." Emcor Reply at 19-20. As a result, Emcor suggests that GAIC has, in fact, waived the particular defense to coverage that it asserts in this case. *See id.* (citing *Gov't Empls. Ins. Co. v. Grp. Hospitalization Med. Servs. Inc.*, 322 Md. 645, 650, 589 A.2d 464, 467 (1991) ("It is well-recognized that an insurer may, by its conduct, be deemed to have waived a condition of its policy.")). GAIC maintains that because Condition 10 "is not an

exclusionary clause by nature," but, rather, "is a general condition which actually operates to extend coverage beyond the policy period," Condition 10 was not responsive to the interrogatory.  *See* GAIC Reply at 15.

Even assuming that GAIC had an obligation to reveal its legal position to Emcor,[18] and that it failed to do so, Emcor's argument is misplaced.  In the same case cited by Emcor, the Maryland Court of Appeals confirmed "a very important qualification . . . '[i]nsurance *coverage* can not be established by waiver.'"  *Gov't Empls. Ins.*, 322 Md. at 650, 589 A.2d at 467 (quoting *Aetna Cas. & Sur. Co. v. Urner*, 264 Md. 660, 668, 287 A.2d 764 (1972)) (emphasis in original).  The court reasoned:

> "[T]he Court of Appeals sees a distinction between defenses founded upon lack of basic coverage and those arising from the failure of the claimant to satisfy some 'technical' condition subsequent.  The former, it is apparent, may not be waived merely by the company's failure to specify them in its initial response to the claim, for the effect of that would be to expand the policy to create a risk not intended to be undertaken by the company."

*Gov't Empls. Ins.*, 322 Md. at 650, 589 A.2d at 467 (quoting *Ins. Co. of N. Am. v. Coffman*, 52 Md. App. 732, 742-43, 451 A.2d 952, 957 (1982)).

GAIC argues that the 2004 Policy did not provide coverage beyond the 2003 Policy, not that Emcor failed to abide by a technical prerequisite in filing its claim.  The effect of Emcor's argument "would be to expand the policy" based on GAIC's response to interrogatories.  *Gov't Empls. Ins.*, 322 Md. at 650, 589 A.2d at 467.  Maryland law does not allow such a result.

---

[18] "Contention interrogatories" can be used to "help pin down an opponent's legal theories in a case as well as the primary facts supporting them.  *Jayne H. Lee, Inc. v. Flagstaff Indus. Corp.*, 173 F.R.D. 651, 652 (D. Md. 1997).  Fed. R. Civ. P. 33(a)(2) provides: "An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until the designated discovery is completed or some other time."  However, there are limits.  *See generally Kendrick v. Sullivan*, 125 F.R.D. 1, 2-3 (D.D.C. 1989) (distinguishing between permissible contention interrogatories, which involve application of law to facts, and impermissible contention interrogatories, which "involve issues of 'pure law'").

Moreover, Emcor has not previously raised this discovery dispute by way of a motion to compel, as required by this Court's Local Rules.  *See* Local Rule 104.8.  Accordingly, GAIC's purported failure to preview Condition 10 as a basis for its motion for partial summary judgment does not open the door to waiver here.

### Conclusion

The 2004 Policy did not affirmatively represent that Emcor held a continuing or continuous insurance contract that accumulated coverage across all three GAIC policies, as well as the FM Policy.  And, construing the 2004 Policy as a whole, other provisions make clear that the coverage period was not as expansive as Emcor claims.  Moreover, Emcor's position is at odds with the character and purpose of the GAIC policies, which clearly provided for "loss sustained" coverage for a finite period of time.  Accepting Emcor's view would effectively re-write the policy terms, providing coverage without any clear limitation.  *See Caloramis*, *supra*, 353 Md. at 445, 727 A.2d at 368; *Canaras*, 272 Md. at 350, 322 A.2d at 873.

For the foregoing reasons, I will grant GAIC's Motion for Partial Summary Judgment (ECF 10) and deny Emcor's Cross Motion for Partial Summary Judgment (ECF 32).  A separate Order follows.


Date: March 27, 2013                              _____/s/_____
                                                  Ellen Lipton Hollander
                                                  United States District Judge